Good morning, Your Honors. My name is Megan Detola, and I represent the appellate in this matter, Leslie Ritchotte. I intend to speak for about eight minutes, and I will watch the clock to make sure I don't go over and reserve two minutes for rebuttal. There's really two points I want to make today, and they both center around one central theme. The judge manufactured improper reasons to discount the opinion of the treating physician and then to reject the subjective complaints of the appellate in this matter. When discussing the treating physician argument, the judge basically had said the reason he is discounting Dr. Wenstrup is because the doctor had assessed pain too quite heavily into the assessment. But that was not the case. If you look at page 331 of the excerpt of record, that is basically the beginning of the treating physician's opinion. He notes clinical findings, including sensory dermatones, decreased muscle strength, and a lack of physical activity. He also noted a lack of physical fitness, as well as ankle flexion problems. On page 332, he references a 1999 MRI, as well as a 2001 MRI. These were all basis of his conclusion. There is a wealth of information that Dr. Wenstrup had available to him prior to issuing this opinion. In fact, there had been three MRIs that had been ordered by Dr. Wenstrup, and prior to issuing his opinion, he had done four full physical evaluations, where he had looked at the patient's physical condition. He had looked at straight leg raising, other neurological involvement. Additionally, he had referred the appellant in this matter to five different neurosurgeons, or five different neurosurgical evaluations. Four were with Dr. Boramium, and one was with Dr. Robson. All this information was available for the doctor to review. I will note, however, the judge does not reference any of this evidence in the decision. There's not even a mention of the MRI in the decision. There's not a mention of Dr. Boramium, the neurosurgeon who evaluated him four times. And Dr. Wenstrup is mentioned in terms of his opinion, and then otherwise just a cursory statement. Opposing counsel in the district court did reference some of this evidence in their decision. Unfortunately, they can't fix what the judge did not do. They can't look at the evidence and evaluate it better than the judge did. That's really one of the first points I want to make, Your Honors. The second point I want to address is the subjective complaints of my client in this matter, the appellant. The judge discounted it, primarily for one reason. There are two cursory reasons he does discuss, but he emphasizes the issue with the word paralysis. My client has a 10th grade education. He's not the most sophisticated, and I will be the first to admit he misused the word paralysis. If you look at how he explains what he is describing as paralysis, however, he described it as pain, numbing, and a burning sensation. And I find it a little bit in bad faith, because at page 70 of the transcript, or page 70 of the excerpt of record, you'll notice that the administrative law judge had a sense that maybe the appellant didn't understand what the word meant. He actually said, do you understand the difference between pain, and they said pain or paralysis. My appellant did not respond. He just started describing the pain. But I do not feel that he was trying to exaggerate and mislead the judge, as the judge had stated in page 49 of the decision. The other issues that he gave in the matter were primarily cursory. They were addressed in one sentence. He said that there had only been conservative treatment, and he had said that there had been inconsistent treatment at that. Well, in regards to the conservative treatment, he was basically just receiving medications, having epidurals, and there was some indication of bed rest and physical therapy. But I will note, he had previously had a three-procedure back surgery. The surgical records are at excerpt of record, page 194 to 195. And there were current discussions going on in regards to the process of having an additional surgery. He had met with both Dr. Buranium four times and another neurosurgeon named Dr. Robson. They assessed his likelihood of improvement to different percentages. I think Buranium had put it at 50 percent, and I think Dr. Robson had said it would be 70 percent. Just improvement in the lower extremities. They both acknowledged that it would not improve back pain at all. So the claimant did testify on page 67 of the excerpt of record that that was why he declined the surgery, the previous surgery, and the fact that the odds of helping the back pain weren't really in his favor. The only other two reasons the judge gave, and it was in one sentence, was the inconsistent treatment. Now, my argument here is there really was not inconsistent treatment in the matter. There had actually, and the district court agreed with this one premise that we had made. He had had a total of, I believe, five evaluations from Dr. Wenstrup before the judge issued the decision, and then the five with the neurosurgical evaluators, as well as the three MRIs that were ordered by Dr. Wenstrup. Now, that seems to be a legitimate, pretty consistent form of treatment. If you do think that maybe that could constitute some inconsistency, that he wasn't seeing someone on a regular month, there were economic problems to be had here. At page 336, Dr. Wenstrup had noted that the claimant had been homeless. Additionally, there had been problems even getting authorization to go through physical therapy. And then finally, there was transportation issues. He was supposed to have an electromyogram, and he wasn't able to make it to the appointment because of problems with a car. So failure to follow prescribed... Counsel, in the hypothetical that was given to the expert, how different was the hypothetical from what Weintraub thought the conditions were? Well, actually, the judge, and this is common to do at the administrative law hearings, did not provide the hypothetical. It did not permit Dr. Wenstrup's opinion to be asked to the VE, because it was below sedentary. He basically assessed that he could not do an eight-hour day, which under the standards of Social Security would preclude work. So what he actually asked the vocational expert was a light RFC, which is lifting 20 pounds occasionally, 10 frequently, sit, stand, walking, six of each. And then what the state agent had given, which was a semi-sedentary, or basically a roted semi-sedentary. Some of the sedentary jobs, but not all. Stand, walk two hours, lift 10, occasionally, less than five frequently. So he had basically asked the state opinions into the record, as well as the CE's opinion into the matter, but had not allowed Dr. Wenstrup's opinion to be read in, just simply because it was below sedentary. So that was primarily the issues there. So the state agent was not able to view the findings of the CE, because the other two state agents had given their reports before the CE found. And the state agent's opinion cannot be given controlling weight, unless it doesn't count as substantial evidence, unless it's based on independent clinical findings. And the state agency had basically acknowledged that they discounted the CE's opinion, because they found that the MRIs and the pain complaints for the client were too significant to adopt that finding. So ultimately, the judge didn't adopt the CE, neither did, and the state agency didn't adopt the CE, but the judge did end up adopting the state agency. And, Your Honors, if you would please, I'd like to reserve the remainder of my time for rebuttal. Thank you. Good morning, Your Honors. I'm Gerilyn Galseth for the Commissioner of Social Security. I just wanted to respond to a couple of points raised by claimants' counsel. The ALJ was looking at an entire record here with respect to Dr. Wenstrup's opinion. There was the consultative examiner's opinion and independent findings, which conflicted with Dr. Wenstrup's findings. Tell me exactly how it conflicted. In July 2001, Dr. Mattaretti examined the claimant and found fairly normal neurological findings. And he said that he didn't need to walk with a cane, his gait was okay. I don't think he found any motor loss, as opposed to Dr. Wenstrup, who said that there was a slight decrease in motor strength. So Dr. Mattaretti's observations, and they're at page 314 of the Certified Administrative Record, full range of motion at the hips, knees and ankles, strength is 5'5", tone was normal. That's significant, because the claimant alleges that he spends most of his days in bed. Reflexes were two out of four in both knees and ankles, straight leg raising was negative. Those are indicating that there are no notable neurological deficits. Station and gait are normal. Now, while the ALJ rejected Dr. Mattaretti's ultimate opinion, he actually did that in favor of the claimant. He found a more restrictive functional capacity at a sedentary level, and found him significantly restricted, that he could sit six hours in an eight-hour day, stand and walk two hours out of an eight-hour day, whereas Dr. Wenstrup found that he could only sit two hours in an entire eight-hour day. I think it was legitimate for the ALJ to question that opinion in light of Dr. Mattaretti's findings, in light of the state agency physician's assessment, Dr. Janssen, whose assessment the ALJ ultimately adopted. As to the exact physical condition, there really, as I looked at it, not much difference. It was just concluding what they could do from that. Isn't that correct, that the clinical findings seem to be substantially the same? Dr. Mattaretti said that he had chronic lumbar pain, he had this disease, and he had spinal stenosis, and arthritis. Those are kind of the same things that the treating doctor said was wrong. So the difference is in the conclusions or the opinion they draw as to what he can do with those conditions. Is that right? Partly, Your Honor. There's certainly no dispute that the claimant has a severe back impairment. But I think that's why Dr. Janssen's opinion is so significant. He addresses that conflict, I think, in his assessment at pages 324 through I think it's 328 of the or 329 of the Certified Administrative Record. He summarizes the MRI findings. He summarizes clinical notes from Dr. Wenstrup. Then on transcript page 325, he summarizes Dr. Mattaretti's independent clinical findings. Clinical findings are different from a doctor's opinion as to what the claimant can do during a workday. Independent clinical findings are range of motion, neurological findings such as reflexes and motor strength. And I think that's why the ALJ's assessment here is reasonable and based on substantial evidence, because Dr. Janssen took these conflicting findings and formed his residual functional capacity, which was a narrow range of sedentary work. With respect to the ALJ's rejection or partial rejection of Dr. Wenstrup's opinion based on the claimant's subjective complaints, I think, again, it was a fair, I mean, certainly the ALJ wasn't saying there was no objective evidence in this record. I mean, we wouldn't have passed step two of the sequential evaluation. We all agree that there's a severe back impairment, which imposes significant functional limitations. But when Dr. Wenstrup claimed that, you know, this 46-year-old man can't sit for more than two hours in an eight-hour day, he felt that was extreme. He was speculating that he would be absent so many days per week, that he had limitations on manipulative functions. That had never come up before, although there was a diagnosis later to do with the hand, but that was in July of 2002. Dr. Wenstrup's opinion was issued in November of 2001. The ALJ, and this is the second point I wanted to make, is he gave legitimate reasons for rejecting the claimant's credibility. The claimant argues that, you know, there are different interpretations, and certainly there may be, but the ALJ was the one sitting there observing the claimant testify. He thought there was an element of exaggeration to his testimony, and that's within the ALJ's preference. I'm sorry, Your Honor. We have several cases that tell us that once there is established clinical medical problems, that we credit the claimant's testimony about his pain. And clearly that has to be partly subjective, but we're supposed to credit it. And when you have back problems, which I can attest to, the pains come and go, and they're more severe and felt more by some people than others. And it seemed to me that on this record, what really got to the ALJ was the use of the word paralysis. That he seemed to think that that caused him to disbelieve the individual. But when the claimant tells you what his symptoms were, oh, yeah, I can move my arm and I can move it up to here. It was very clear he didn't know what paralysis meant. And so it seems to me that that's not a basis for discrediting his testimony about pain. As I look at this record. I think there are two points to make in response to that. One, with respect to the so-called two-pronged cotton test. One is the ALJ first looks to see if there's an impairment that's established by the record, and whether it could reasonably produce the symptoms that the claimant complains of. And then number two, if so, you proceed to number two and decide whether on the record the claimant's complaints are properly supported or whether they're credible. In this case, I think there's two aspects to that paralysis issue. One, if you look at the beginning of the claimant's testimony at the September 2002 hearing. He talks about paralysis and, you know, whatever he meant by that. He talks about it in his left arm. And this entire record is about low back pain and leg pain. And all of a sudden he's testifying at the hearing that he's got this left arm paralysis. And there are two points to that. One, again, is I think the ALJ could reasonably interpret that just by use of the word paralysis, the claimant was maybe trying to exaggerate his condition. It may not be the only reasonable interpretation of that evidence, but I think it's common knowledge that a paralyzed individual is, you know, is in pretty bad shape. The second thing is, what was the impairment that was causing a problem with his arm? It was the claimant himself who made this link between his low back condition and his arm. Now, that didn't make anatomical sense. There was, admittedly in July of 2002, he complained of some arm symptoms, and I think Dr. Wenstrup didn't diagnose carpal tunnel syndrome, which is a far cry from left arm paralysis. And I believe he was prescribed splints. The claimant didn't make any mention of that at the hearing. He didn't say, well, I have this new condition in my arm, it's carpal tunnel. I mean, you know, this was a gentleman who was seeking medical treatment primarily for his back. I don't think it was completely unreasonable for the ALJ to say, well, where's this coming from? And by the way, it seems a little exaggerated in view of the record. And again, the ALJ made other observations, not just the paralysis factor. Number one, there was an occasion in which the claimant's on emergency room treatment, where he left without completing or signing off the form. It was a little mystifying. He indicated that he couldn't sit up, and the nurse came back, and a half an hour later he was gone, after he found out he wouldn't be admitted. And just one point about conservative treatment, we hear a lot about that. But it was a legitimate factor in this record. The claimant was on the same regimen of medications for quite a few years and admitted that they did provide him with pain relief. Thank you, Your Honors. Your time has expired. Thank you very much. Ms. Sotola. Thank you, Your Honors, and I'll be brief. Two points I want to make as a rebuttal, basically. Number one, the judge did not evaluate the entirety of the record. In fact, he actually really just evaluated the opinion evidence. And as I had mentioned before, there's no mention of the opinion evidence. He really just assessed the different opinions in the files, with no discussion of the physical evaluations, except the one that was done by the CE. And of course the state examiners hadn't done it. In regards to the problems with the left arm, yes, that doesn't seem to be connected to the back pain. But at page 26 and 27, Dr. Wenstrup did note that he had positive phalans and positive tingles in his hand, which is indicative of carpal tunnel syndrome. At page 31, they also looked at that. Now, the appellant may have improperly talked about it as if it was related to his hand, but we cannot rely on the appellant in the diagnosis. I do think there is paralysis. I do not think there is paralysis in the matter, but I think it's clear that we just had an unsophisticated appellant who was unable to address what was really going on in the scenario. Additionally, in addition to the consultative examiner's evaluation that he had done, there is indication that there was neurological involvement throughout this record. At page 293 through 294, page 297, page 306 and 307, there was positive straight-legged raising test, which indicates a problem with sciatic distribution. So there were actually some more significant clinical findings that were given by Dr. Wenstrup in this matter. But I think just based on the entirety of the evidence, there's really no reason to discount the treating physician. He should be entitled to controlling weight, because it is based on substantial evidence. Additionally, there's no reason to discount the testimony of the appellant in this matter. There was really just a weak analysis done about a simple word paralysis. Other than that, there was no discussion of his daily activities. There was no discussion of what he does throughout the day, and he had mentioned he had spent most of his day lying down. There was no discussion of sodden, celebrex, vicodin, and soma. And so to look at this and discount his testimony based on this arbitrary reason of a misuse of a word paralysis is unfounded. And, Your Honors, I would just ask that you consider the entirety of the whole either reversing or remanding this case. Thank you very much. Thank you.
judges: Fletcher, Rymer, Duffy